UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK,
WHITE PLAINS DIVISION

| | |
|---|---|
| QHC UPSTATE MEDICAL, P.C., | Index No.: _____ |
| Plaintiffs, | VERIFIED COMPLAINT |
| -against- | Plaintiff Requests Trial By Jury |
| CENTENE CORPORATION, NEW YORK QUALITY HEALTHCARE CORPORATION d/b/a FIDELIS CARE and REFUAH HEALTH CENTER, INC., | |
| Defendants. | |

Plaintiff, QHC Upstate Medical, P.C. ("QHC Medical") by its attorneys, Anderson Kill, P.C., as and for its verified complaint against Centene Corporation ("Centene"), New York Quality Healthcare" Corporation d/b/a Fidelis Care ("Fidelis") and Refuah Health Center ("Refuah") (Collectively referred to as the "Defendants") sets forth and alleges as follows:

## PARTIES

1.     Plaintiff QHC Medical is a New York Professional Service Corporation duly organized and existing under the laws of the State of New York and maintains a place of business at 1 Main Street, Monsey, New York. QHC Medical is a medical services provider founded and operated by Dr. Seth Kurtz, MD. QHC Medical maintains various locations and provides a broad range of services to its patients, including primary care, podiatry, emergency care and cardiology.

2.     On July 5, 2022 (the "QHC Filing Date"), QHC Medical filed a voluntary petition for reorganization pursuant to Chapter 11 of Title 11 of the United States Code, 11 U.S.C. Sections 101, *et seq.*, as amended by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 (the "Bankruptcy Code") in the United States Bankruptcy Court, Southern District of New 1

docs-100515242.1

York, Case No. 22-22410 (SHL) (the "Bankruptcy Case") and has continued in possession of its property and management of its business affairs pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

3.　No official committee of unsecured creditors or examiner has been appointed herein.

4.　Eric Huebscher has been appointed Subchapter V Trustee. As provided in 11 U.S.C. Section 1184, QHC Medical is the representative of the QHC Medical Estate, with the capacity to sue and be sued pursuant to 11 U.S.C. Section 323.

5.　This action is maintained by QHC Medical in its capacity as a debtor-in-possession as statutory trustee pursuant to Section 1107 of the Bankruptcy Code, which vests in the debtor-in-possession all of the duties and powers of a trustee.

6.　Centene, a Fortune 100 company, is based in St. Louis, Missouri with West Coast headquarters in Sacramento, California and East Coast Headquarters in Charlotte, North Carolina. Centene has a presence in 50 states and 3 international markets, according to its website. It is a managed healthcare insurance company with revenue of $126.0 billion for the full year of 2021. Centene announced its acquisition of Fidelis as a wholly-owned subsidiary on September 12, 2017 for $3.75 billion, effective on July 1, 2018.

7.　Fidelis, is a New York corporation licensed by the New York State Department of Health to operate as a Health Maintenance Organization pursuant to Article 44 of the New York State Public Health Law. Fidelis maintains a place of business at 95-25 Queens Boulevard, Rego Park, New York 11374.

8.　Refuah, a Federally Qualified Heath Center, is a New York Not-For-Profit Corporation duly organized and existing under the laws of the State of New York.　Refuah

2

maintains an address at 728 North Main Street, Spring Valley, New York and is a competitor of QHC Medical.

## JURISDICTION AND VENUE

9.     The United States District Court for the Southern District of New York has related jurisdiction over this action pursuant to 28 U.S.C. Section 1334(b), as this action is related to the Bankruptcy Case of *In Re*: QHC Upstate Medical P.C.

10.    Venue is proper in the United States District Court for the Southern District of New York, White Plains Division, pursuant to 28 U.S.C. Section 1409(a), where the Bankruptcy Case is pending and 28 U.S.C. 1451 where QHC Medical maintains its principal office.

## STATEMENT OF FACTS

### QHC's Medical's Business

11.    QHC Medical is a medical services provider and maintains various locations and provides a broad range of services to its patients, including primary care, podiatry, emergency care and cardiology.

12.     QHC Medical began as a summer practice in 2009 to provide services to people who migrated to Sullivan and Ulster counties during the summer months.  To meet this patient demand and due to the overwhelmingly, positive patient feedback concerning the medical services provided, QHC Medical opened new practices in the following locations: a year round practice in Brooklyn in February 2017; in Staten Island in March 2018; and, in Rockland County in September 2018.

13.    Since QHC Medical opened the Rockland County location in September 2018, it has had more than 70,000 patient visits of which approximately 80% were enrollee patients insured by Fidelis.

3

14.    The Rockland County location is a multi-specialty group with patient visits consisting of specialty care runs while providing a varied array of medical services consisting of primary care, emergency care, radiology, podiatry, and cardiology.  It operates in the afternoon and evenings and provides emergency services and diagnostic imaging and receives referrals from multiple primary care and specialty providers in Rockland County.

15.    Upon information and belief, no other health care provider in Rockland County provides the same level and scope of services that QHC Medical provides to its patients at the Rockland County location and QHC Medical is the only health care provider in Rockland County who offers imaging services after regular business hours with the exception of hospital emergency departments.

16.    Upon information and belief, a significant number of citizens of Rockland County rely on state and federal medical services such as, Medicaid and Medicare to pay for critical healthcare services provided by QHC Medical.

**Harm to Enrollee Patients/Consumers**

17.    A direct and foreseeable result of the illicit, group boycott scheme detailed herein to eliminate QHC Medical as a provider to enrollee patients/consumers will be direct and substantial harm to those very enrollee patients/consumers.  This illicit, group boycott scheme will have an impactful consequence not only on enrollee patients/consumers in Rockland County in accessing essential medical care but, would also force state and federal programs to use limited funding to pay for far more expensive, medical services, *e.g.*, at hospital emergency departments.

18.    On or about June 20, 2011, QHC Medical entered into a Standard Health Services Agreement (the "Agreement") with Fidelis' predecessor, the New York State Catholic Health Plan, Inc.  The Agreement was automatically renewed year after year.

4

19.     Since entering into the Agreement with Fidelis, QHC Medical has maintained an Upstate practice that treats thousands of campers at various summer camps in Ulster and Sullivan counties and maintains two offices in Sullivan County. From its inception, QHC Medical's arrangement with Fidelis was primarily for the purpose of seeing the enrollee patients (*i.e.*, the campers) outside of their primary care provider ("PCP") where their PCP was not available to provide such medical care.

20.     Pursuant to the Agreement, QHC Medical, as provider, was to render healthcare services to "Enrollees" of Defendant (*See,* Paragraph 2.1 of the Agreement). Enrollees are defined as individuals entitled to receive health care services arranged for by the plan (*See,* Paragraph 1.5 of the Agreement). The Agreement sets forth the relationship between QHC Medical and Fidelis and their respective obligations and responsibilities to one another. Among other things, the Agreement provides:

> "Services provided to Enrollees by Provider and Personnel shall be performed in the same manner, on the same basis and in accordance with the same standards offered to all of the other patients of Provider and shall be available and accessible to all Enrollees S*ee,* Paragraph 2.2.1 of the Agreement).

21.     Fidelis, in return, agreed to be responsible for the following pursuant to the Agreement:

> "3.1. Administrative and Other Services. Plan shall be ultimate responsible for all administrative and management of Health Care Services, as necessary to establish and operate a prepaid health services plan for Enrollees, including but not limited to the following:
>
> 3.1.1. Financial and Claims Payment Services. Plan shall provide all financial services, which shall include, at a minimum, billing under the Program Contract, appropriate financial reporting and, where applicable, claims payment to Provider."

22.     In addition to the foregoing, Paragraph 5 of the Agreement memorializes the "Financial Relationship" between the parties. Specifically, Paragraph 5.1.1. provides that,

5

"Provider shall bill Plan for all Provider Services rendered to Enrollees by Provider or Personnel pursuant to the terms of this Agreement..."

    23.    Paragraph 5.3 ("Timing of Payment") provides:

> "... payment for services rendered shall be made within thirty (30) days of receipt by Plan of electronic Clean Claim. All payments will be made in accordance with the requirements of Section 3224-a of the New York State Insurance Law. Plan shall only be responsible for payment to Provider of Clean Claims received within ninety (90) calendar days of service, unless such claims have been subject to recovery through coordination of benefits or unless otherwise required by law. If adjustments in the payment are required for any reason, they shall be made in due course during subsequent regular payment cycles."

    24.    Paragraph 4.1 of the Agreement ("Quality Assurance and Utilization Management") provides that "Provider shall participate in and comply with and require all Personnel to participate in and comply with the quality assurance program, implemented pursuant to Section 3.1.2 above, to promote the rendering of quality health care and quality service. Provider understands that said quality assurance program shall include a peer review program with respect to treatment of all Enrollees."

    25.    Paragraph 8.4.2 of the Agreement provides as follows:

> "Any or either party's rights to receive its respective payments for claims for Provider Services (under Article 5 above), and any sums that were earned, or due and owing, as the case may be, prior to termination or expiration of this Agreement shall continue in effect."

    26.    Paragraph 1.16 of the Agreement identifies the programs and program contracts and provides, in relevant part, as follows:

> "'Program' shall mean those Federal, state or other programs, identified in Schedule 1.16 of this Agreement, under which Plan arranges to provide prepaid health services to Enrollees on a contractual basis. Schedule 1.16 may be amended by Plan from time to time to add or delete Programs."

**Fidelis' Baseless Audit of QHC Medical on Behalf of Refuah**

27.    QHC Medical performed and provided all medically necessary services for Fidelis enrollee patients pursuant to and in accordance with the Agreement.

28.    Despite QHC Medical's performance in full compliance with the terms of the Agreement, on March 29, 2019, Fidelis, under the pretext of performing an "audit" pursuant to the Agreement between the parties, sent a letter informing QHC Medical that it was auditing nearly five years of claims, and that it was seeking recovery of $1,904,807.24 (the "Audit Letter"). The Audit Letter also requested that QHC Medical contact the Fidelis Special Investigation Unit "within one week to discuss repayment as well as an appropriate corrective plan". The Audit Letter also alleged "improper billing" during a nearly five-year period, but, did not provide any details or supporting documentation to substantiate Fidelis' baseless allegations.

29.    QHC Medical would later learn that the Audit Letter, and the purported "audit" that followed, was a coordinated, retributive and retaliatory, illegal act initiated by Refuah, a competing provider in the same geographical market as QHC Medical.

30.    Upon information and belief, Fidelis' audit procedures were subjective, arbitrary and without any basis and were initiated as an illicit, group boycott scheme by Refuah in concert with and in full agreement with Centene and Fidelis as a Per Se violation of the Sherman Act, 15 USCA Section 1, as a restrictive trade practice or, in the alternative a violation of the Sherman Act, Section 1 under the Rule of Reason analysis.

**Fidelis' Unwarranted Termination of QHC Medical's Agreement**

31.    More than two weeks after Fidelis sent the Audit Letter to QHC Medical, on April 15, 2019, Alicia L. Delmont, Chief Provider Operating Officer, sent a letter to QHC Medical informing it that Fidelis was providing "Notice of Non-Renewal of the Standard Health Service

7

Agreement" between the parties and that the Agreement "will terminate effective June 20, 2019." (the "Termination Notice").

32.      At the time the Termination Notice was sent, QHC Medical had come to rely extensively on Fidelis payments in that they constituted a significant portion of its total gross revenue or approximately 80 percent from its Monsey location. The improper termination of the Parties' Agreement caused great damage to QHC, its business and its reputation, not to mention its enrollee patients, and effected an illegal restraint of trade in violation of the Sherman Act, as detailed herein.

33.      Upon information and belief, QHC Medical has learned that the audit conducted by Fidelis was part of the illicit, group boycott scheme initiated by Refuah in a concerted action with Centene and Fidelis, causing significant and monetary damage to QHC Medical's business, all of which as part of its illicit group boycott scheme with Centene and Fidelis by refusing to reimburse QHC Medical for its properly administered medical care to its enrollee patients.

**Refuah's Unlawful Collusion with Fidelis to Target QHC Medical**

34.      Unbeknownst to QHC Medical at the time, Fidelis' Audit and subsequent Termination of the Agreement, was the culmination of a conspiracy among the Defendants to drive QHC Medical out of the market entirely through their illicit, group boycott scheme.

35.      During the discovery in the litigation captioned, *QHC Upstate Medical, P.C. v. New York Quality Healthcare Corporation d/b/a Fidelis Care* in the Supreme Court of the State of New York, County of Rockland, Index No. 036072/2019, Fidelis' Officers gave sworn testimony (herein referred to in the Exhibits as "Deposition Testimony") and produced documents establishing the prima facie elements of Sherman Act violations under Sections 1 and 2, as more fully outlined herein.

8

36.     A number of key personnel of Fidelis in their deposition testimony stated that the audit of QHC Medical was initiated at the instigation of Refuah.

37.     Harold Guglielmo, Assistant Vice President of Fidelis' Special Investigations Unit, testified to having no prior knowledge whatsoever of QHC Medical before the initiation of the audit by Refuah's personnel, Mrs. Sternberg and Mr. Ostreicher but, being well aware of Refuah as "a big provider in our network." Exhibit 1 at 101, lines 24-25.

38.     Mr. Guglielmo even testified to having been to Refuah's offices, but never having been to QHC's. Exhibit 1 at 102, line 21. Similarly, Fidelis' John Place testified to having "been at [Refuah's] locations on a few occasions, meeting with their principals and talking about the various services that we are contracted with them for," but on the other hand, having no knowledge of QHC. Exhibit 2 at 102, line 20.

39.     It is apparent from this Testimony that Refuah was a critical partner of Fidelis and Centene – thereby creating an incentive for Fidelis and Centene to engage in anti-competitive conduct in support of Refuah and eliminate Refuah's competition, QHC Medical.

40.     Refuah's partnership with and influence over Fidelis/Centene was unquestionably the predicate basis for Fidelis' audit and eventual termination of the Agreement with QHC Medical.

41.     Several key personnel at Fidelis consistently testified that it was Refuah who intentionally colluded with Fidelis/Centene to initiate the audit of QHC Medical's billing practices.

42.     During his deposition testimony, Fidelis' John Place unequivocally agreed that "the QHC investigation was not initiated by Fidelis/Centene but, was originally started when there was a complaint by Refuah." Exhibit 2 at 62, line 24.

9

43.     Also, in her deposition testimony, Fidelis' Alicia Delmont-Vorburger, also stated that she understood that in the Fall of 2018, Fidelis began investigating QHC Medical only due to an inquiry raised by Refuah. Exhibit 3 at 13, lines 23-25 and, at 44, line 19.

44.     An internal email dated October 4, 2018, from David Thomas, then-CEO of Fidelis and current Executive Vice President at Centene, to Ms. Delmont-Vorburger of Fidelis, further substantiates the origin of the illicit, group boycott scheme among Centene, Fidelis and Refuah as follows: "Per our conversation, Refuah is concerned that there is another group marketing urgent care services to our Rockland County members." (Emphasis supplied). This email specifically identifies Dr. Seth Kurtz and QHC Medical as being of Refuah's "concern."

45.     Starting on October 25, 2018, and on November 13, 2018, Jennifer White of Fidelis began copying and Emailing Centene personnel, Lauri DeWald, Manager of IT at Centene Corporation regarding the investigation of QHC Medical. On February 25, 2019, Ms. DeWald on Centene letterhead instructed Fidelis personnel, Jennifer White, in three Emails to confirm, inter alia, the existence of claims for "Dr. Kurtz". On February 26, 2019, Ms. DeWald replied to Carey Shoemaker regarding the investigation of claims for QHC Medical. Hence, Centene's collusion with Fidelius from the very beginning of the investigation of QHC Medical.

46.     Further, an internal, Fidelis Email dated November 13, 2018, provides as follows:

"Carey,

What reason would we have to recover claims?

Harry"

47.     Additional Deposition Testimony from Carey Shoemaker, Vice President for Fidelis' Provider Services, further substantiates that it was an "inquiry from Refuah Health Center

that caused Fidelis to look at QHC Medical" and triggered the baseless audit process and termination in the first place. Exhibit 4 at 13, line 5.

48.     Ms. Shoemaker further testified that she could not recall previously referring any similar inquiry to Fidelis' Special Investigations Unit based on another provider's inquiry and that she was unaware of any legal action ever taken against other providers predicated on the purported reasons for QHC Medical's audit. Exhibit 4 at 41, line 14 and 20.

49.     Refuah's relationship with Fidelis/Centene and the illicit actions perpetrated on QHC Medical are calculated and designed to cause substantial financial harm to QHC Medical, not to mention being outside the customary scope of Fidelis' business relations with such medical providers; in short, such actions constitute an illicit, group boycott scheme in violation of Sections 1 and 2 of the Sherman Act.

50.     An internal, Fidelis Email on February 25, 2019, and prior to the audit, provides further evidence of the persistence of this illicit, group boycott scheme, which constitutes the concerted action and agreement necessary for a Sherman Act violation:

> Hi Pam,
>
> I connected with David a short while ago.  He wants me to get the Urgent Care Provider names that came up during the Refuah meeting.  These are the Urgent Care providers that we are still paying claims to.
>
> Can you please send those names to me so that I can get Alicia in the loop, and we can try to address.

51.     A mere three days later on February 28, 2019, Carey Shoemaker in an Email further insisted on investigating QHC Medical on Refuah's behalf -- evidencing Fidelis' desire to advance the collusion with Refuah -- when she wrote to Mr. Guglielmo, requesting that he again "take a look at [QHC Medical]." In the same email, Ms. Shoemaker distinctly noted, "Refuah continues to express concerns regarding this provider's practices." (Emphasis supplied).

52.     The collusion continued as more than a year later on July 31, 2020, Refuah pressed

on in continuing to collude with Fidelis/Centene. An internal, Refuah Email from Leah Nussbaum

substantiates the collusion that led to the illicit, group boycott scheme as follows:

> Good morning,
>
> I just hung up with Fidelis. They were calling to discuss the issue of our members
> over utilizing a local urgent care. They called it by a different name QHC Medical
> but based on the address I was able to identify it as Care 365. I spoke with
> Mrs. Sternberg (from Refuah) and this should be escalated to an
> administrative/board level. Mrs. Sternberg is requesting a meeting with herself,
> Alexandra, Mr. Ostreicher, Brenda Stoubenfield and the representatives I spoke
> with.

In short, there is no question that Refuah and Fidelis/Centene are inextricably linked in the

furtherance of their illicit, group boycott scheme to harm QHC Medical's business and efforts to

drive it out of the product and geographic markets.

53.     **Product Market.**

The product market is defined as a multi-specialty care that includes primary care,

emergency medicine, podiatry and cardiology.

54.     **Geographic Market.**

The geographic market is defined as Brooklyn, Staten Island, Rockland County in New

York and Bergen County, New Jersey.

55.     **McCarran-Ferguson Act does not render inapplicable the Sherman Act to
Centene's and Fidelis' health insurance business. 15 USCA Sections 1013(b) and (c)(1).**

According to 15 USCA Section 1013(b), "Nothing contained in this chapter shall render

the said Sherman Act inapplicable to any agreement to boycott, coerce, or intimidate, or act of

boycott, coercion or intimidation". Further, 15 USCA Section 1031(c)(1) specifies that, "Nothing

contained in this chapter shall modify, impair, or supersede the operation of any of the antitrust

12

laws with respect to the business of health insurance…" Hence, the McCarran-Ferguson Act does not exempt either Centene or Fidelis from liability under the Sherman Act.

56.     **Standing, Antitrust Injury.**

QHC Medical has standing to bring these claims as it is enduring harm and significant damages from injuries that the Sherman Act was intended to prevent and that flows from the illicit, group boycott scheme of Centene, Fidelis and Refuah, which precludes QHC Medical from competing in a free and open marketplace and hindering the delivery of its specialized and beneficial medical services to its enrollee patients for the last eight years. Moreover, QHC Medical is directly affected by the monopoly and attempted monopoly scheme of Centene and Fidelis, which has been a direct and material cause of QHC Medical's professional and financial injuries, as more fully detailed herein, as well as the civil conspiracy and tortious interference with business relations causes of action.

### FIRST CAUSE OF ACTION-PER SE VIOLATION OF THE SHERMAN ACT, SECTION 1, 15 USCA SECTION 1: RESTRAINT OF TRADE, ILLICIT GROUP BOYCOTT SCHEME; Centene, Fidelis and Refuah

57.     QHC Medical repeats and realleges each and every allegation contained in Paragraphs 1 through 56 above, as if same were fully set forth at length herein.

58.     Defendants have restrained competition by entering into an illicit, horizontal group boycott scheme, as detailed herein in the defined product and geographic markets thereby preventing QHC Medical from competing in a free and open marketplace and hindering the delivery of its specialized and beneficial medical services to its enrollee patients.

59.     Defendants' unlawful group boycott activities constitute a per se violation of the Sherman Act, Section 1.

60.     These contracts, combinations, or agreements have caused substantial, anticompetitive effects, which include the following: a.) excluded competition from the defined product and geographic markets; b.) have restricted the variety of such medical services available to the enrollee patients; c.) by reduced enrollee patients' choice, have ultimately reduced the quality of care to enrollee patients; and, d.) have artificially reduced output/availability of these medical services in the relevant product and geographic markets, while ultimately causing increased prices for the enrollee patients.

61.     The following evidence of claims paid substantiates the financial relationship between Centene/Fidelis and Refuah and provides further proof of the reason Fidelis and Centene entered into the illicit, group boycott with Refuah. The "Percent of Claim Dollars Paid" by Fidelis to Refuah for Essential Plan Payers starting in 2016 through 2021 is as follows: 99.79% in 2016; 99.07% in 2017; 99.58% in 2018; 99.63% in 2019; 97.35% in 2020; 94.12% in 2021; and, 43.40% as of July 2022. The total percentage from 2016 to July 2022 equals 98.83%. This data was provided by Definitive Healthcare, a healthcare commercial intelligence provider, that provides information for providers and payers. *https://www.definitivehc.com.*

62.     These contracts, combinations, or agreements have no legitimate, pro-competitive business purpose by excluding QHC Medical from the marketplace and caring for its enrollee patients. They achieve no legitimate, efficiency benefit to counterbalance the plain, anticompetitive effects that they cause.

63.     As a result of these violations of Section 1 of the Sherman Act, QHC Medical has been injured in its business and property in an amount not presently known, but which is, at a minimum, millions of dollars, prior to trebling as provided under Section 4 of the Clayton Act.

64.     By and through the Defendants' aforesaid acts and omissions and their agreements to commit said acts and omissions, and in furtherance of their illicit, group boycott scheme, the Defendants, acting alone and in concert with each other have restrained trade by impairing QHC Medical's method of doing business by depriving it and their enrollee patients of its medical care coverage.

65.     As a result of the Defendants' aforesaid acts and omissions and their agreement to commit said acts and omissions, QHC Medical has been caused to suffer extensive monetary damages and are reasonably expected to suffer such monetary damages. The Defendants illicit, horizontal scheme constitutes an illicit, group boycott, a Per Se violation of the Sherman Act.

66.     QHC Medical's elimination from the marketplace will not only force it to suffer significant monetary damages as a business, but also have impactful consequences on the enrollee patients in the market itself. In the realm of healthcare, where the need for timely, affordable, and accessible services is most critical, the harm detailed herein from the illicit, group boycott to the market is especially damaging and impactful.

67.     Upon information and belief, the enrollee patients in Rockland County in need of medical care will experience a lack of choices in medical providers, significant increased wait times, decreased access after business hours, and no access to certain critical, urgent care services, such as imaging, after-hours all together. Rather, enrollee patients will be forced to incur additional expense and wait times at a hospital emergency department.

68.     An overwhelming number of citizens of Rockland County rely on state and federal services such as Medicaid and Medicare to pay for critical healthcare services formerly rendered by QHC Medical. Accordingly, those with subsidized healthcare, who are often those most

15

vulnerable, will be disproportionately affected by, *inter alia*, longer and more expensive commute, extended wait time, and less access to healthcare providers.

69.     State and federal agencies will also bear the significant burden of being forced to pay for more expensive medical services, such as at a hospital emergency department, due to the unavailability of after-hours care formerly provided at QHC Medical.

**SECOND CAUSE OF ACTION- VIOLATION OF THE SHERMAN ACT, SECTION 1, 15 USCA SECTION 1, UNDER RULE OF REASON: UNREASONABLE RESTRAINT OF TRADE, ILLICIT GROUP BOYCOTT SCHEME; Centene, Fidelis and Refuah**

70.     QHC Medical repeats and realleges each and every allegation contained in Paragraphs 1 through 69 above, as if same were fully set forth at length herein.

71.     In the addition to constituting a Per Se violation, the Defendants' conduct also violates Section 1 of the Sherman Act in that it constitutes an unreasonable, vertical restraint of trade under the Rule of Reason.  QHC Medical asserts that Defendants' contracts, combinations, and agreements, consisted of, among other things, a vertical agreement by Defendants to eliminate competition in the product and geographic markets in providing services to enrollee patients, the effect of which is to steer patients to Refuah and away from QHC Medical and thereby cause significant harm to QHC Medical, its enrollee patients, the consumers of this medical care,  and a general deterioration of medical care throughout the relevant geographic market.

72.     By and through the Defendants' aforesaid acts and omissions and their agreements to commit said acts and omissions, and in furtherance of their illicit, vertical group boycott scheme, the Defendants, acting alone and in concert with each other have rendered QHC Medical effectively incapable of participating and competing in the product and geographic markets, as defined herein, and therefore impeded and prevented QHC Medical from participating and

16

competing in the geographic market by being unable to provide medical care to its enrollee patients. The Defendants' illicit scheme constituted a vertical, group boycott of QHC Medical.

73. The following evidence of claims paid substantiates the financial relationship between Centene/Fidelis and Refuah and provides further proof of the reason Fidelis and Centene entered into the illicit, group boycott with Refuah. The "Percent of Claim Dollars Paid" by Fidelis to Refuah for Essential Plan Payers starting in 2016 through 2021 is as follows: 99.79% in 2016; 99.07% in 2017; 99.58% in 2018; 99.63% in 2019; 97.35% in 2020; 94.12% in 2021; and, 43.40% as of July 2022. The total percentage from 2016 to July 2022 equals 98.83%. This data was provided by Definitive Healthcare, a healthcare commercial intelligence provider, that provides information for providers and payers. *https://www.definitivehc.com*.

74. As a result of the Defendants' aforesaid acts and omissions and their agreement to commit said acts and omissions which rendered QHC Medical unable to participate and compete in the product and geographic markets, as defined herein, QHC Medical has been caused to suffer extensive monetary damages amounting to a significant loss of its business and ability to provide medical care for its enrollee patients.

75. QHC Medical's elimination from the marketplace will not only force it to suffer significant monetary damages as a business, but also have impactful consequences on the enrollee patients in the market itself. In the realm of healthcare, where the need for timely, affordable, and accessible services is most critical, the harm detailed herein from the illicit, group boycott to the market is especially damaging and impactful.

76. Upon information and belief, the enrollee patients in Rockland County in need of medical care will experience a lack of choices in medical providers, significant increased wait times, decreased access after business hours, and no access to certain critical, urgent care services,

17

such as imaging, after-hours all together. Rather, enrollee patients will be forced to incur additional expense and wait times at a hospital emergency department.

77.     An overwhelming number of citizens of Rockland County rely on state and federal services such as Medicaid and Medicare to pay for critical healthcare services formerly rendered by QHC Medical. Accordingly, those with subsidized healthcare, who are often those most vulnerable, will be disproportionately affected by, *inter alia*, longer and more expensive commute, extended wait time, and less access to healthcare providers.

78.     State and federal agencies will also bear the significant burden of being forced to pay for more expensive medical services, such as at hospital emergency departments, due to the unavailability of after-hours care formerly provided at QHC Medical.

## THIRD CAUSE OF ACTION-VIOLATIONS OF THE SHERMAN ACT, SECTION 2, 15 USCA SECTION 2: MONOPOLIZATION; Centene and Fidelis

79.     QHC Medical repeats and realleges each and every allegation contained in Paragraph 1through 78 above, as if same were fully set forth at length herein.

80.     Centene and Fidelis possess monopoly power in the defined, relevant product and geographic markets which is inferred from their respective, market shares in excess of 70%-78% for Rockland County from 2021-2017 in total Medicaid, Essential Plan and Qualified Health Plan (Fidelis-76.9% and Centene-76.9% in 2021; Fidelis-76.6% and Centene-78.3% in 2020; Fidelis-74.6% and Centene-76.5% in 2019; Fidelis-73.2% and Centene-74.9% in 2018; and, Fidelis-70.6% and Centene-72.4% in 2017), from which it has acquired and maintained its monopoly power through its illicit group boycott scheme, exclusionary practices and anticompetitive conduct, as detailed herein and as distinguished from growth or development as a consequence of a superior product, business acumen or historic accident.

18

81.     Fidelis and Centene's monopolization over the relevant product and geographic markets restricts enrollee patients: a.) choices in medical providers; b.) increases wait times; c.) decreases access after business hours; and d.) eliminates access to certain critical urgent care services, such as imaging, after-hours. As a consequence of the monopolization of Fidelis and Centene, enrollee patients will be forced to incur additional expense and wait times at a hospital emergency department. In the realm of healthcare, where the need for timely, affordable, and accessible services is most critical, the harm detailed herein from the illicit, group boycott to the market is especially damaging and impactful

82.     Moreover, an overwhelming number of citizens of Rockland County rely on state and federal services such as Medicaid and Medicare to pay for critical healthcare services formerly rendered by QHC Medical. Accordingly, those with subsidized healthcare, who are often those most vulnerable, will be disproportionately affected by, *inter alia*, a longer and more expensive commute, extended wait time, and curtailed access to healthcare providers.

83.     State and federal agencies will also bear the significant burden of being forced to pay for more expensive services, such as at a hospital emergency department, due to the unavailability of after-hours care formerly provided by QHC Medical.

**FOURTH CAUSE OF ACTION-VIOLATION OF THE SHERMAN ACT, SECTION 2. 15 USCA SECTION 2: ATTEMPTED MONOPOLIZATION.**
**Centene and Fidelis**

84.     QHC Medical repeats and realleges each and every allegation contained in Paragraphs 1 through 83 above, as if same were fully set forth at length herein.

85.     In the alternative and as more fully detailed herein, Centene and Fidelis have engaged in anticompetitive conduct by engaging in a group boycott against QHC Medical with a specific intent to monopolize the defined relevant markets and Centene and Fidelis exhibit a

dangerous probability of achieving monopoly power, which is inferred from their significant market shares, as set forth herein in Paragraph 69 in the product and geographic markets.

86.     There is a dangerous probability that Centene and Fidelis will achieve a monopoly in the relevant product and geographic markets.

87.     Centene and Fidelis has and will restrain, suppress, and eliminate actual and potential competition for enrollee patients in the product and geographic markets.

88.     Fidelis and Centene's attempted monopolization over the relevant product and geographic markets restricts enrollee patients: a.) choices in medical providers; b.) increases wait times; c.) decreases access after business hours; and, d.) eliminates access to certain critical services, such as imaging, after-hours. As a consequence of the attempted monopolization of Fidelis and Centene, enrollee patients will be forced to incur additional expense and wait times at a hospital emergency department. In the realm of healthcare, where the need for timely, affordable, and accessible services is most critical, the harm detailed herein from the illicit, group boycott to the market is especially damaging and impactful.

89.     Moreover, an overwhelming number of citizens of Rockland County rely on state and federal services such as Medicaid and Medicare to pay for critical healthcare services formerly rendered by QHC Medical. Accordingly, those with subsidized healthcare, who are often those most vulnerable, will be disproportionately affected by, *inter alia*, a longer and more expensive commute, extended wait time, and curtailed access to healthcare providers.

90.     State and federal agencies will also bear the significant burden of being forced to pay for more expensive services, such as at a hospital emergency department, due to the unavailability of after-hours care formerly provided by QHC Medical.

20

91.     QHC Medical and the enrollee patients have been and will be denied the benefits

of unrestricted competition in a free and open market because of the conduct of Centene and Fidelis

in attempting to monopolize the product and geographic markets.

92.     Centene's and Fidelis' conduct constitute a violation of Section 2 of the Sherman

Act.

## FIFTH CAUSE OF ACTION-CIVIL CONSPIRACY
### (Centene, Fidelis and Refuah)

93.     QHC Medical repeats and realleges each and every allegation contained in

Paragraphs 1 through 92 above, as if same were fully set forth at length herein.

94.     Defendants' contracts, combinations, and agreements consisted of, among other

things, an agreement by Defendants to eliminate competition in the product and geographic

markets in providing services to enrollee patients, the effect of which is to steer patients to Refuah

and away from QHC Medical, and thereby cause significant professional and financial harm to

QHC Medical, its enrollee patients, and generally deteriorate medical care throughout the relevant

geographic market.

95.     Defendants' intentional agreement to wrongfully and illegally exclude QHC

Medical from the product and geographic markets as a result of an illicit, group boycott constitutes

both a *Per Se* violation of the Sherman Act and a violation of the Sherman Act under the Rule of

Reason, as set forth herein.

96.     As evidenced by the deposition testimony and Email correspondence referenced

herein, Refuah overtly acted in furtherance of this agreement by persistently requesting that Fidelis

and/or Centene "investigate" and "audit" QHC Medical's billings without basis and with intent to

harm QHC Medical's business.

21

97.     Fidelis and Centene acted in furtherance of the agreement by actually investigating, auditing, and ultimately declining to renew their contract with QHC Medical – effectively eliminating QHC Medical as a functional medical provider entirely due to Fidelis' and Centene's significant monopoly power, which has enabled them to monopolize or in the alternative to attempt to monopolize the relevant market.

98.     Defendants' agreement and overtly tortious actions have caused substantial damage to QHC Medical's business and the market as a whole.

99.     Fidelis', Centene's and Refuah's agreement and overtly tortious actions have rendered QHC Medical unable to participate and compete in the product and geographic markets, as defined herein, and QHC Medical has incurred extensive monetary damages amounting to a significant loss of its business.

100.    Defendants' agreement and overtly tortious actions have caused substantial damage to the market in eliminating patients' options for health care services, and restricting access to after-hours care significantly.

## SIXTH CAUSE OF ACTION - TORTIOUS INTERFERENCE
## WITH BUSINESS RELATIONS.
### Refuah

101.    QHC Medical repeats and realleges each and every allegation contained in Paragraphs 1 through 100 above, as if same were fully set forth at length herein.

102.    Since 2011, QHC Medical had a contract with Fidelis' predecessor, the New York State Catholic Health Plan, Inc. and with Fidelis thereafter, which was automatically renewed year after year.

103.    Pursuant to the Agreement, QHC Medical, as provider, was to render healthcare services to "Enrollees" of Fidelis. Consistent with the Agreement, QHC Medical rendered critical

22

docs-100515242.1

medical services to Fidelis' enrollees – largely citizens of Rockland County, New York for many years.

104.   On or about the Fall of 2018, Refuah tortiously and unlawfully interfered with the longstanding business relationship between QHC Medical and Fidelis' by, among other things,

(a.)   insisting that Fidelis and/or Centene baselessly audit QHC Medical for the sole purpose of harming QHC Medical's business;

(b.)   entering into an agreement with Fidelis and/or Centene;

(c.)   unlawfully boycotting QHC Medical, in violation of the Sherman Act; and

(d.)   attempting to and/or actually forming an illegal monopolization of the relevant Rockland County healthcare market, as defined herein.

105.   Refuah's tortious interference has rendered QHC Medical unable to participate and compete in the product and geographic markets, as defined herein, and QHC Medical has been caused to suffer extensive monetary damages amounting to a significant loss of its business.

106.   Refuah's tortious interference has caused substantial damage to the market in eliminating enrollee patients' options for health care services, and restricting access to after-hours care significantly.

**WHEREFORE**, QHC Medical demands that a judgment be entered in its favor and respectfully requests the following relief:

1.   On its First Cause of Action, for violation of the Sherman Act, against all Defendants, joint and severally, for compensatory damages in an amount to be determined at trial, in addition to treble damages, costs, interest and reasonable attorney fees pursuant to Section 1 of the Sherman Act and Section 4 of the **Clayton Act** and injunctive relief**,** as more fully detailed below.

2.      On its Second Cause of Action, against all Defendants, joint and severally, for compensatory damages in an amount to be determined at trial, in addition to treble damages, costs, interest and reasonable attorney fees pursuant to Section 1 of the Sherman Act and Section 4 of the Clayton Act.

3.      On its Third Cause of Action, against Centene and Fidelis, joint and severally, for compensatory damages in an amount to be determined at trial, in addition to treble damages, costs, interest and reasonable attorney fees pursuant to Section 2 of the Sherman Act and Section 4 of the Clayton Act.

4.      On its Fourth Cause of Action against Centene and Fidelis, joint and severally, for compensatory damages in an amount to be determined at trial, in addition to treble damages, costs, interest and reasonable attorney fees pursuant to Section 2 of the Sherman Act and Section 4 of the Clayton Act.

5.      On its Fifth Cause of Action against all Defendants, jointly and severally, for compensatory damages in an amount to be determined at trial, in addition to costs, interest and any other relief this Court deems just and proper.

6.      On its Sixth Cause of Action against Refuah, for compensatory damages in an amount to be determined at trial, in addition to costs, interest and any other relief this Court deems just and proper.

7.      That the Court declare, adjudge and decree that Defendants have committed the violations of federal antitrust law under the Sherman Act, Sections 1 and 2.

8.      That Defendants, their directors, officers, employees, agents, successors, and assigns be enjoined and restrained from, in any manner, directly or indirectly, (1) "steering"

24

docs-100515242.1

patients that have been referred to QHC Medical away from the QHC Medical to Refuah; and

(2) committing any other violations of federal antitrust law under the Sherman Act.

For such other and further relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, QHC Medical hereby

demands a trial by jury as to all matters triable thereby.

Dated: New York, New York
      August 30, 2022

Respectfully submitted,

ANDERSON KILL P.C.

By: _____
Sheldon Eisenberger
Paul M. Kaplan
Keith A. Lazere
1251 Avenue of the Americas, 42nd floor
New York, NY 10020
(212) 278-1000
seisenberger@andersonkill.com
pkaplan@andersonkill.com
klazere@andersonkill.com

*Attorneys for Plaintiff*
*QHC UPSTATE MEDICAL, P.C.*

25

VERIFICATION

STATE OF NEW YORK )
ss.:
COUNTY OF Rockland

Seth Kurtz,, being duly sworn, deposes and says:

I am _Seth Kurtz President_ of **QHC UPSTATE MEDICAL, P.C.**, the Plaintiff in this action, and am authorized to execute this Verification. I have read the foregoing Verified Complaint, know the contents thereof, and the same is true to my own knowledge, except as to the matters therein stated to be alleged upon information and belief, and as to those matters, I believe them to be true. The sources of such information and belief are Plaintiff's records.

_____
Seth Kurtz

Sworn to before me    this _30_ day of August 2022

Notary Public

SHEANAN J MARTINEZ
Notary Public - State of New York
NO. 01MA6327870
Qualified in Rockland County
My Commission Expires Jul 20, 2023

26